CAMPBELL KELLEHER, EXECUTOR, ESTATE OF DANIEL KELLEHER, DECEASED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 65998.   Promulgated August 7, 1936.

*David D. Jarvis, Esq.*, for the petitioner.
*Elden McFarland, Esq.*, for the respondent.

OPINION.

McMahon: The only issue presented for our decision is whether the respondent erred in determining that the decedent derived taxable income in the taxable period January 1 to February 20, 1929, upon the sale of 6,371 shares of the new stock of the bank having a par value of $20 per share. This number of shares includes both the 6,071 shares and the 300 shares referred to in the assignments of error. No question is raised as to the correctness of the amount of profit determined by the respondent or as to his determination that a part of it constituted ordinary gain and a part capital net gain. Furthermore, there is no controversy between the parties as to whether only one-half of the gain derived is taxable to the decedent in view of the community property laws of the State of Washington. The only question is whether the amount determined by the respondent from the sales of both the 6,071 shares and the 300 shares was income in such taxable period, it being the contention of the petitioner that the transaction was not closed until after the death of the decedent, his death having occurred February 20, 1929. The petitioner concedes that sales of the new stock were made during the period, but contends that the sales by the bank were a part of the plan or transaction which was not completed prior to February 20, 1929. In any event we are satisfied that the sales of the new stock had been completed. The purchase price had been received by the bank and interim receipts had been issued and most of the new certificates had been delivered prior to the death of the decedent. The applicable provisions of the statutes and regulations are sections 22, 41, and 42 of the Revenue Act of 1928, and article 332 of Regulations 74.

It is true that certificates for the new shares of stock of the bank having a par value of $20 per share which were sold never were delivered to the decedent nor did the decedent, during his lifetime, physically transfer the old certificates to the bank for cancellation. However, the decedent in holding his own old stock and that of his associates acted in the dual capacity of representative of himself and associates and as representative of the bank, being chairman of its board and a member of its executive committee, and further delivery of the old shares would add nothing of consequence. When, on January 10, 1929, the stockholders at a meeting increased the number of shares of stock from 20,000 to 100,000 shares and reduced the par value of each share from $100 to $20, each stockholder then became entitled to his proportion of the new shares and became entitled to certificates representing the same upon perfection of the amendment to the charter of the corporation and surrender of the old certificates. The cancellation of the old certificates and the issuance of new certificates, the decedent being in possession of the old certificates for the bank, were matters of form and routine only. Transfer of stock on the books of a corporation, is not essential to ownership of the shares represented by them. *Emma W. Davis*, 32 B. T. A. 943. The old certificates were, in fact, canceled on March 4, 1929, as of January 10, 1929. There was nothing to prevent their cancellation previous to February 20, 1929; and in this respect the decedent was in control of the situation. Furthermore, as the new shares were sold the corresponding old certificates should have been canceled. To the extent that this was not done, as appears from our findings of fact, the business of the bank was, in this respect, conducted loosely to say the least.

The bank, in selling these new certificates through its officers, as appears from our findings, was acting in the capacity of agent for decedent and his associates. It is well settled that income received by an agent is income to the principal at the time received by the agent. *Frank E. Best*, 21 B. T. A. 1264; *George L. Craig*, 7 B. T. A. 504; and *F. H. Wilson*, 12 B. T. A. 403. The bank received payment for all the shares sold prior to the death of the decedent. The payments received by the bank constituted income of the decedent and his associates at the time received by the bank; and the decedent is taxable on his share of the income. Of similar import are *Walter S. Dickey*, 14 B. T. A. 1295; petition to review denied in *Dickey* v. *Burnet*, 56 Fed. (2d) 917; certiorari denied, 287 U. S. 606; and *D. H. Byrd*, 32 B. T. A. 568. Furthermore, before the date of the death of the decedent there had been appropriated by the associates $1,673,825 of the total amount of the proceeds of $2,270,800. The decedent himself had appropriated, prior to the

time of his death, at least $317,300, and there is no showing that he could not have appropriated all of his share of the proceeds of the sale of the stock at any time prior to his death. The evidence shows that there was nothing in any agreement, written or oral, preventing appropriation at any time. Thus there was no time set for the termination of the selling and the evidence shows that there was not even an agreement as to the amount of stock that was to be sold. The only reason the associates did not appropriate the proceeds in full prior to decedent's death was because it was more convenient to wait until it was finally decided that no more stock would be sold. So far as the record shows, the proceeds of the sales of the stock were all available forthwith to decedent, prior to his death, as the money was paid for the new shares. There were no controlling contingencies to bar prompt appropriation, which was in the control of the decedent. The proceeds from the sales of decedent's stock must therefore be regarded as, at least, constructively received by him; actual receipt is not essential. *J. L. McInerney*, 29 B. T. A. 1; affirmed in *McInerney* v. *Commissioner*, 82 Fed. (2d) 665; *William Parris*, 20 B. T. A. 320; *Ella C. Loose, Executrix*, 15 B. T. A. 169; and Regulations 74, art. 332, *supra*. As stated in this *Parris* case, "The test as to constructive receipt is whether the debtor has funds standing to the credit of the taxpayer which the debtor is able to pay and which are *available* and subject to the taxpayer's demand." (Emphasis supplied.) This language is particularly apt in the instant proceeding in view of all of the capacities which the decedent possessed and the completeness with which he dominated the situation, and especially as to those proceeds in his personal account subject to withdrawal by him only. We also quote from Regulations 74, art. 332, as follows:

*Income not reduced to possession.*—Income which is credited to the account of or set apart for a taxpayer and which may be drawn upon by him at any time is subject to tax for the year during which so credited or set apart, although not then actually reduced to possession. To constitute receipt in such a case the income must be credited or set apart to the taxpayer without any substantial limitation or restriction as to the time or manner of payment or condition upon which payment is to be made, and must be made available to him so that it may be drawn at any time, and its receipt brought within his own control and disposition. * * *

It is immaterial that the decedent and his associates did not know, at or prior to the time of the decedent's death, the amount of all of the stock sold or the proceeds thereof. They could have known. All the factors necessary to a computation of these amounts were available at all times, and there remained merely a matter of computation. In reality the decedent and his associates each sold his own shares of

stock, notwithstanding that they did so in conformity with some rather indefinite plan of cooperation or concert of action; they did not even enter into a clear-cut agreement, much less a written formal agreement; and the proceeds of the sales were in their control and available to them at all times, especially those of the decedent, who dominated the situation. In the situation here presented there is no sound basis for approving the postponement, at the election of the decedent or otherwise, of the incidence of Federal income taxation under the applicable statutes and regulations. As stated in *William Parris, supra*, "If he [the taxpayer] elected not to take possession of income which was subject to his demands because of some benefit which would thereby accrue to him, the amount is nevertheless *constructively* received." (Emphasis supplied.)

Under all the facts and circumstances shown here the respondent was correct in determining that the decedent derived taxable income in the period January 1 to February 20, 1929, from the sale of his new stock, and respondent's determination is approved; in any event, the petitioner has not established that the action of the respondent is erroneous.

*North American Oil Consolidated* v. *Burnet*, 286 U. S. 417, and *A. G. Hull*, 33 B. T. A. 178, are distinguishable.

The decedent had, prior to his death, paid out from the Seattle National Co. Trust account in the discharge of his personal indebtedness, $120,000, which was all he was entitled to from that account, and had withdrawn $197,300 from the Kelspatru account, which was all he was entitled to from that account. These were the only accounts involved other than his personal account; and, at the time of his death, there was $70,000 in that account in excess of what belonged to him, subject to withdrawal by him only. None of the proceeds in his personal account other than the $70,000, and none of the proceeds thus taken by him from the other accounts, were recoverable from his estate after his death. This, looking to substance, is the ultimate result viewed from decedent's standpoint as to what actually happened before his death in reference to the proceeds of the sales of his stock. It may be added that the $70,000 only was paid to his associates by his estate after his death.

Reviewed by the Board.

*Decision will be entered for the respondent.*

----

LEECH, dissenting: There is certainly no apparent reason here to disregard the separate corporate entity of the bank and what was actually done.

The majority opinion finds as a fact that the proceeds of the sales of split-up stock, though deposited in petitioner's account,

"were not his [decedent's] property by reason of being deposited therein." The amount so deposited was substantially more than the amount ultimately determined as due decedent. Under the agreement between the decedent, his associates and the bank, disclosed in the findings of fact, decedent had no right to any part of those proceeds, without restriction as to its disposition, except as loan or advance, *until* the old stock was delivered to the bank. True, when decedent died, his estate was liable to the bank for advances to decedent, and was obligated to perform decedent's contract to deliver the old stock to the bank. But, under that same agreement, he could not have secured the proceeds of the sale without delivery of the old stock and, in fact, he *did not* deliver any of that stock to the bank during his lifetime. Therefore, the sale of the stock in question was not complete at the time of his death, and no part of those proceeds was taxable income to decedent. *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417.

The doctrine of constructive receipt should be sparingly applied. We refused to apply the rule in *A. G. Hull*, 33 B. T. A. 178. The facts there were, at least, no stronger for petitioner than here. The decision in that case, in my judgment, is contrary to the conclusions reached in the majority opinion.

BLACK agrees with this dissent.